UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

MICHAEL GUEVARA, et al.,

                                      Plaintiffs,                    CONSOLIDATED
                                                                 Case No. 07 Civ. 6941 (CS)

        -against-

PHILIP AMICONE AND THE CITY OF YONKERS,

                                  Defendants.
------------------------------------------------------------------------X
PHLIP AMICONE,

                    Counterclaim/Third-Party Plaintiff,

        -against-

RICHARD BLASSBERG, SELIM ZHERKA, AND
GUARDIAN NEWS, INC.,

                  Counterclaim/Third-Party Defendants.

------------------------------------------------------------------------X

---

**MEMORANDUM OF LAW IN SUPPORT OF MAYOR AMICONE'S
MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE
ALTERNATIVE, FOR A NEW TRIAL AND/OR REMITTITUR**

---

                                        DELBELLO DONNELLAN WEINGARTEN
                                        WISE & WIEDERKEHR, LLP
                                        1 North Lexington Avenue
                                        White Plains, New York 10601
                                        (914) 681-0200
                                        Attorneys for Philip Amicone

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT................................................................. 2

LEGAL ARGUMENT........................................................................3

I.  Mayor Amicone is Entitled to Judgment As a Matter of Law in the
    Absence of Any Evidence of His Personal Participation....................... 3

II.  Mayor Amicone is Entitled to Qualified Immunity............................. 6

III.  The Trial Court Inappropriately Admitted Hearsay
     Testimony Against Mayor Amicone........................................... 10

    A.  Hearsay Testimony Cannot be Used to Satisfy Plaintiffs'
        Burden to Corroborate Their Emotional Distress Claims............. 11

    B.  The State of Mind Exception Does Not Apply When
        Testimony is Offered to Prove the Ultimate Issue..................... 12

    C.  The Cumulative Impact of the Hearsay Testimony Was
        Highly Prejudicial to Mayor Amicone................................ 13

    D.  The Hearsay Testimony Allowed the Plaintiffs to Incite the
        Jury to Award Punitive Damages Against Mayor Amicone...........14

IV.  The Missing Witness Charge Was Legally Incorrect and Unfairly
     Prejudiced the Jury Against Mayor Amicone................................... 16

V.  The Jury's Award of Punitive Damages Should be Set Aside
    as a Matter of Law.................................................... 19

VI.  Amicone is Entitled to a New Trial or Reduction of the
     Punitive Damages Award.................................................. 21

    A.  The Punitive Damage Award is Unconstitutional..................... 21

    B.  The Punitive Damage Award is Excessive............................23

        1.  The First *Gore* Guidepost: Reprehensibility................... 24

        2.  The Second *Gore* Guidepost: Disparity Between
            Actual Harm and Punitive Damages Award................... 25

i

                                                                                        **Page**

        3.     The Third *Gore* Guidepost: Comparison to Awards in
              Comparable Cases............................................... 27

    C.     The Amount of the Award Should be Significantly Reduced ........ 31

VII.    Amicone is Entitled to Judgment as a Matter of Law or, in the
       Alternative, a New Trial on his Counterclaim and Third-Party
       Claim for Defamation *Per Se*..................................................... 32

    A.     The Statement Was Defamatory *Per Se*...............................33

    B.     The Statement Referred to Mayor Amicone........................... 34

    C.     The Statement Was Published......................................... 34

    D.     The Statement Was False............................................. 35

    E.     The Statement Was Published With Actual Malice.................... 36

        1.     The Counterclaim Defendants Wanted Mayor
              Amicone to Lose the 2007 Mayoral Election.................. 37

        2.     The Counterclaim Defendants Previously Published
              Numerous Articles that Were Highly Critical of
              Mayor Amicone's Performance................................. 38

        3.     Zherka Caused Eleven Lawsuits to be Filed Against
              Mayor Amicone and/or the City of Yonkers Prior
              to November 1, 2007............................................... 38

        4.     Blassberg Made No Efforts to Confirm the
              Truthfulness of the Defamatory Statement.................... 39

        5.     Zherka Lacked Knowledge as to the
              Truthfulness of the Defamatory Statement.................... 39

        6.     The Counterclaim Defendants Recklessly Published
              that Mayor Amicone "Frequents Strip Clubs"................. 39

CONCLUSION..................................................................... 40

## TABLE OF AUTHORITIES

**Case**                                                                                           **Page**

*Agostino v. Simpson,*
    2008 U.S. Dist. LEXIS 93094 (S.D.N.Y. 2008)...........................................3

*Anderson v. Creighton,*
    483 U.S. 635 (1987)................................................................... 7-8

*Back v. Hastings on Hudson Union Free Sch. Dist.,*
    365 F.3d 107 (2d Cir. 2004).............................................................. 3

*Bisignano v. Korff,*
    2001 WL 1772172 (S.D.N.Y. 2001)..................................................... 29-30

*Boehner v. Heise,*
    2010 U.S. Dist. LEXIS 83800 (S.D.N.Y. 2010)..........................................11

*BMW of North America, Inc. v. Gore,*
    517 U.S. 424, 116 S.Ct. 1589 (1996)............................................21 and *passim*

*Carey v. Piphus,*
    435 U.S. 247 (1978)...................................................................11

*Celle v. Filipino Reporter Enterprises, Inc.,*
    209 F.3d 163 (2d Cir. 2000)............................................................37

*Church of Scientology Int'l v. Behar,*
    238 F.3d 168 (2d Cir. 2001)............................................................36

*Cooper Industries, Inc. v. Leatherman Tool Group, Inc.,*
    532 U.S. 424 (2001).................................................................. 21

*DeLeon v. Little,*
    1999 WL 1490299 (D. Conn. 1999)............................................27, 29, 31

*DiSorbo v. Hoy,*
    343 F.3d 172 (2d Cir. 2003)....................................................23 and *passim*

*Exxon Shipping Co. v. Baker,*
    128 S.Ct. 2605 (2008)..............................................................24, 26

*Fedrizzi v. Washingtonville Sch. Dist.,*
    204 A.D.2d 267, 611 N.Y.S.2d 584 (2d Dept. 1994)................................. 34

| Case | Page |
|------|------|

*Fincher v. Depository Trust & Clearing Corp.,*
604 F.3d 712 (2d Cir. 2010)....................................................... 5

*Galdieri-Ambrosini v. National Realty Development Corp.,*
136 F.3d 276 (2d Cir. 1998)....................................................... 3

*Gonzalez v. Bratton,*
147 F. Supp. 2d 180 (S.D.N.Y. 2001)..................................... 20, 23

*Grayned v. City of Rockford,*
408 U.S. 104 (1972)................................................................ 22

*Heller v. Doe,*
509 U.S. 312 (1993)................................................................. 9

*Lee v. Edwards,*
101 F.3d 805 (2d Cir. 1996)................................................23 and *passim*

*Malley v. Briggs,*
475 U.S. 335 (1986)................................................................ 7

*Marshisotto v. City of New York,*
2007 WL 1098678 (S.D.N.Y. 2007)........................................33

*Martinez v. The Port Authority of New York and New Jersey,*
2005 U.S. Dist. LEXIS 19141 (S.D.N.Y. 2005).........................16-17

*Mathie v. Fries,*
121 F.3d 808 (2d Cir. 1997)................................................... 28

*Meloff v. New York Ins. Co.,*
240 F.3d 138 (2d Cir. 2001)................................................... 33

*Mendez-Matos v. Municipality of Guaynabo,*
557 F.3d 36 (1st Cir. 2009)....................................................29

*Monteiro v. City of Elizabeth,*
436 F.3d 397 (3d Cir. 2006)................................................ 29, 31

*Morales v. City of New York,*
2001 WL 8594 (S.D.N.Y. 2001)..............................................20

*Munafo v. Metropolitan Transp. Auth.,*
285 F.3d 201 (2d Cir. 2002)................................................... 7

| Case | Page |
|------|------|

*Patrolmen's Benevolent Assoc. of the City of New York v. The City of New York,*
 310 F.3d 43 (2d Cir. 2002)................................................................. 11

*People v. Reynoso,*
 73 N.Y.816, 537 N.Y.S.2d 113 (1988).....................................................12

*Poe v. Leonard,*
 282 F.3d 123(2d Cir. 2002)...............................................................7

*Provost v. City of Newburgh,*
 262 F.3d 146 (2d Cir. 2001)............................................................ 27

*Roberts v. United States Jaycees,*
 468 U.S. 609 (1984)................................................................... 22

*Ryduchowski v. The Port Auth. of N.Y. and N.J.,*
 203 F.3d 135 (2d Cir. 2000)........................................................... 3, 32

*Sarno v. Douglas Eilliman-Gibbons & Ives, Inc.,*
 183 F.3d 155 (2d Cir. 1999)........................................................... 11

*Saucier v. Katz,*
 533 U.S. 194 (1981).................................................................. 7

*Shady Records, Inc. v. Source Enterprises, Inc.,*
 2004 U.S. Dist. LEXIS 26143 (S.D.N.Y. 2005)........................................12

*Sharratt v. Hickey,*
 20 A.D.3d 734, 799 N.Y.S.2d 299 (3d Dept. 2005).................................... 33

*Shatner v. Page,*
 2009 WL 260788 (S.D. Ill. 2009)..................................................... 26-27

*Song v. Ives Lab., Inc.,*
 957 F.2d 1041 (2d Cir. 1992)......................................................... 33

*Sound Aircraft Servs., Inc. v. Town of East Hampton,*
 192 F.3d 329 (2d Cir. 1999)........................................................... 6-7

*Spelman v. Netzel,*
 1995 WL 290392 (N.D. Ill. 1995)..................................................... 29, 30

*Stack v. Jaffe,*
 306 F. Supp. 2d 137 (D. Conn. 2003)................................................27, 29, 30

| Case | Page |
|------|------|

*State Farm Mut. Automobile Ins. Co. v. Campbell,*
    538 U.S. 408, 123 S.Ct. 1513 (2003)................................................21 and *passim*

*Stern v. Cosby,*
    645 F. Supp. 2d 258 (S.D.N.Y. 2009)....................................................33, 36-37

*Thomas v. iStar Financial, Inc.,*
    520 F. Supp. 2d 478 (S.D.N.Y. 2007)..................................................... 30

*United States v. Erb,*
    543 F.2d 438 (2d Cir. 1976)................................................................. 17

*United States v. Gaskin,*
    364 F.3d 438 (2d Cir. 2004)................................................................. 17

*United States v. Landau,*
    155 F.3d 93 (2d Cir. 1998)................................................................. 23

*United States v. Ouimette,*
    798 F.2d 47 (2d Cir. 1986)................................................................. 17

*United States v. Torres,*
    845 F.2d 1165 (2d Cir. 1988)................................................................ 17

*Van-Go Transport Co., Inc. v. New York City Bd. of Educ.,*
    971 F. Supp. 90 (E.D.N.Y. 1997)......................................................... 34

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X

MICHAEL GUEVARA, et al.,

                      Plaintiffs,                CONSOLIDATED
                                                         Case No. 07 Civ. 6941 (CS)

        -against-

PHILIP AMICONE AND THE CITY OF YONKERS,

                      Defendants.

--------------------------------------------------------------------------X

PHLIP AMICONE,

               Counterclaim/Third-Party Plaintiff,

        -against-

RICHARD BLASSBERG, SELIM ZHERKA, AND
GUARDIAN NEWS, INC.,

              Counterclaim/Third-Party Defendants.

--------------------------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF MAYOR AMICONE'S
MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE
ALTERNATIVE, FOR A NEW TRIAL AND/OR REMITTITUR**

       Defendant and Counterclaim/Third-Party Plaintiff Philip Amicone ("Mayor Amicone" or

the "Mayor"), by and through his attorneys, DelBello Donnellan Weingarten Wise &

Wiederkehr, LLP, respectfully submits this memorandum of law, together with the

accompanying Declaration of Brian T. Belowich, Esq. dated November 11, 2010 ("Belowich

Dec."), and all of the pleadings and proceedings previously had herein, all in support of Mayor

Amicone's post-trial motion for an Order: (i) granting judgment as a matter of law dismissing

Plaintiffs' claims against Mayor Amicone, or alternatively ordering a new trial on the issue of

whether punitive damages are warranted, and if so in what amount, or alternatively ordering a

reduction of the punitive damages award to an amount that is not unconstitutionally excessive; (ii) granting to Mayor Amicone judgment as a matter of law on his counterclaim and third-party claim for defamation *per se* or, alternatively, ordering a new trial on Mayor Amicone's counterclaim and third-party claim for defamation *per se*; and (iii) granting to Mayor Amicone such other and further relief as this Court deems just and proper.

## PRELIMINARY STATEMENT

Without direct evidence of Mayor Amicone's personal involvement in the removal of newspaper boxes or the issuance of summonses, the jury's finding against Mayor Amicone was based on sheer speculation and conjecture, enhanced by unconstitutionally incited passion and prejudice. In reaching that finding, the jury was allowed to consider hearsay testimony, purportedly allowed for its impact on certain witnesses, but which instead veered impermissibly into the ultimate question to be tried (*i.e.,* the Mayor's personal involvement in the alleged conduct). In restating Plaintiffs' question to one witness, even the Court inadvertently articulated the truth of the ultimate issue and hence severely prejudiced the Mayor. Having repeatedly heard evidence that was inadmissible, and having been given an erroneous missing witness charge that further prejudiced the Mayor, the jury awarded a shocking $8,000,000 in punitive damages against Mayor Amicone. This astronomical sum is grossly disproportionate to the compensatory damages awarded, and represents a denial of Mayor Amicone's fundamental Due Process and Equal Protection rights. Mayor Amicone is therefore entitled to judgment as a matter of law, or alternatively, a new trial on the issue of punitive damages, or a reduction of the punitive damages award to an amount that is not unconstitutionally excessive. Because of the prejudice resulting from these factors, Mayor Amicone is also entitled judgment as a matter of law or, alternatively a new trial, on his counterclaim and third-party claim for defamation *per se*.

**LEGAL ARGUMENT**

I.    **MAYOR AMICONE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW IN THE ABSENCE OF ANY EVIDENCE OF HIS PERSONAL PARTICIPATION**

"A motion for judgment as a matter of law may be granted where 'there is such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture, or if the evidence is so overwhelming that reasonable and fair minded persons could only have reached the opposite result.'" *Ryduchowski v. The Port Auth. of N.Y. and N.J.,* 203 F.3d 135, 141-42 (2d Cir. 2000) (citations omitted). A court must consider a motion for judgment as a matter of law "in light of the [applicable] substantive law." *Galdieri-Ambrosini v. National Realty Development Corp.,* 136 F.3d 276, 289 (2d Cir. 1998).

To prevail on a claim under 42 U.S.C. § 1983 brought against an individual defendant, a plaintiff must establish, by a preponderance of the evidence, that the individual defendant personally participated in the conduct representing a violation of the plaintiff's constitutional rights. *See Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122 (2d Cir. 2004). As this Court stated in a related case, to prevail at trial, a "plaintiff must come forward with evidence establishing the actual involvement of [the defendant] in <u>each of the violations</u> for which [a plaintiff] seeks to hold [him] responsible." *Agostino v. Simpson,* 2008 U.S. Dist. LEXIS 93094, *14 (S.D.N.Y. 2008) (Seibel, J.) (emphasis added).

In this case, regardless of whether Plaintiffs established interference with the distribution of the *Westchester Guardian* newspaper (the "*Guardian*"), there is such a paucity of admissible evidence regarding the involvement of Mayor Amicone in any such activity, that the jury's finding against him could only have been the result of sheer surmise or conjecture, enhanced by unconstitutionally incited passion and prejudice.

3

In fact, the only direct evidence regarding Mayor Amicone came from the testimony of John Liszewski, the Commissioner of the Yonkers Department of Public Works. Mr. Liszewski testified about a telephone call that he had with Mayor Amicone. Specifically, Mr. Liszewski testified that Mayor Amicone called and told him about two newspaper boxes located on or near the steps of the Will Library that were impeding the right of way, and asked him to "have it checked out." *See* Belowich Dec., Ex. E at 64:19-64:23. By way of impeachment, Plaintiffs' attorney read from a portion of Mr. Liszewski's deposition where he stated that the Mayor had mentioned "two more boxes," as opposed to "two boxes." *See id.* at 65:1-66:3. But, as the Court noted, that deposition testimony was not offered for the truth, only to impeach. *See* Belowich Dec., Ex. H at 755:3-755:6. Accordingly, there was no direct evidence, admitted for its truth, that Mayor Amicone asked Commissioner Liszewski to remove any *Guardian* news boxes. Similarly, no direct evidence was admitted demonstrating that the Mayor personally instructed or directed the police department to issue summonses to persons distributing the *Guardian*.

In the absence of any direct evidence that Mayor Amicone ordered the removal of news boxes or the issuance of summonses, the jury was left, as the Court noted, with a "highly circumstantial case." *See* Belowich Dec., Ex. H at 755:3-755:12. Reviewing what little circumstantial evidence was introduced, however, leaves only the most tenuous and insufficient of connections to Mayor Amicone.

The first piece of circumstantial evidence is general in nature and constitutes the mere fact that shortly following the publication of stories containing critical comments about Mayor Amicone, *Guardian* newspaper boxes were removed. Plaintiffs' theory is that Mayor Amicone read the stories and, responding in anger, personally ordered the removal of the *Guardian* boxes. The problem with this theory, however, is that no evidence was admitted to prove that Mayor

4

Amicone actually read any of the critical stories before the boxes were removed.[1] *Cf. Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010).

The second piece of circumstantial evidence concerning the Mayor was testimony from Selim Zherka ("Zherka") to the effect that Police Officer Wood told him that the "Mayor's Office" had directed him to issue tickets to persons distributing newspapers. *See* Belowich Dec., Ex. G at 473:15-475:24. But even assuming the statement of Officer Wood was admissible as an exception to the hearsay rule pursuant to Rule 801(d)(2)(D), nothing in the statement implicates Mayor Amicone personally. Similarly, Officer Wood did not say, even according to Zherka's biased account, that he had been ordered specifically to target persons distributing the *Guardian*, as opposed to newspapers generally. As noted above, there was no evidence before the jury that Mayor Amicone actually read any of the *Guardian* articles before the summonses were issued. There was also no evidence that the Mayor was even aware that the summonses were issued.

The only other references to Mayor Amicone on Plaintiffs' case were made in the context of hearsay statements that were offered not for the truth of the matters asserted therein, but rather only for the effect the statement may have had on a given Plaintiff's emotional well being. *See, e.g.,* Belowich Dec., Ex. E at 138:14-139:9; Ex. F at 286:20-287:9, 325:21-326:21, 356:6-21. The Court made clear, however, that anything testified to in this context, including anything regarding the Mayor, was to be considered only for its effect on the listener, and not for the truth of anything contained in the statement. The following passage provides a good example.

Q:          And what was it that Eric told you that affected you?

BELOWICH: **Objection**

---

[1] The only testimony that even arguably supports Plaintiffs' theory is that Mayor Amicone saw the "Dumb and Dumber" headline on the front cover of the July 12, 2007 edition of the *Guardian* and discussed it with David Simpson and Ernie Davis. *See* Belowich Dec., Ex. G at 619:16-620:16; Ex. E at 94:11-95:15.

COURT:   Again, ladies and gentlemen, anything Eric may have said is not in for its truth. If Eric said something and the plaintiffs don't prove that something through **independent evidence**, you can't consider it, but the affect that it may have had on the witness may be considered.

Q:   So what was it Eric told you about why the paper was not available?

A:   That the Mayor of Yonkers, Mayor Amicone, there was some misunderstanding, something like that; that he and another, his rival, because it was coming up to election time, and they got in some discrepancy, and it will, it will bring about a scandal to the Mayor of his doings, put it like that.

COURT:   All right. Again, ladies and gentlemen, there is – **if the plaintiffs want you to believe that Mayor Amicone had something to do with the removal of the papers because of the political rivalry, they have to prove it through evidence here in the courtroom.**

Belowich Dec., Ex. F at 325:21-326:14 (emphasis added).

Plaintiffs never offered independent evidence of the personal involvement of Mayor Amicone. Instead, Plaintiffs were permitted to taint the jury by offering significant hearsay testimony, and having been allowed to deliberate and reach a verdict on Mayor Amicone's personal involvement, the jury believed, incorrectly, that direct evidence must have been submitted. At the end of the trial, the jury was left with no direct evidence of Mayor Amicone's involvement, circumstantial evidence offering the most tenuous and insufficient of connections to the Mayor, and a series of hearsay statements not offered for their truth. Under these circumstances, the jury's finding of liability against Mayor Amicone on Plaintiffs' claims was reached as a result of pure conjecture and speculation, unfairly incited by passion and prejudice. Mayor Amicone is therefore entitled to judgment as a matter of law.

## II.   MAYOR AMICONE IS ENTITLED TO QUALIFIED IMMUNITY

Qualified immunity "serves important interests in our political system," *Sound Aircraft Servs., Inc. v. Town of East Hampton*, 192 F.3d 329, 334 (2d Cir. 1999), chief among them to

6

ensure that damages suits do not "unduly inhibit officials in the discharge of their duties" by saddling individual officers with "personal monetary liability and harassing litigation." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). This case provides an excellent example of "harassing litigation." As discussed on page 38, *infra*, Zherka has caused no fewer than <u>sixteen</u> federal lawsuits to be filed against the Mayor and/or the City of Yonkers since August 2007.[2]

"A government official sued in his individual capacity is entitled to qualified immunity (1) if the conduct attributed to him was not prohibited by federal law; or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was objectively legally reasonable[] . . . in light of the legal rules that were clearly established at the time it was taken." *Munafo v. Metropolitan Transp. Auth.*, 285 F.3d 201, 210 (2d Cir. 2002). Conduct is objectively reasonable where officers or public officials of reasonable competence could disagree as to whether the defendant's conduct violated a plaintiff's clearly-established constitutional rights. *See Malley v. Briggs*, 475 U.S. 335, 344-45 (1986); *Poe v. Leonard,* 282 F.3d 123, 133 (2d Cir. 2002). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Briggs,* 475 U.S. at 341. Hence, if a government official is not "on notice that his conduct would be clearly unlawful, [a] judgment based on qualified immunity is appropriate." *Saucier v. Katz,* 533 U.S. 194, 202 (1981).

The First Amendment guarantees of freedom of speech and freedom of the press are clearly established. Nevertheless, in assessing whether qualified immunity applies, it is not enough to rest on this general notion. Rather, the analysis must be on a fact-specific level to determine whether the law prohibiting the specific conduct in question was "clearly established"

---

[2] Zherka caused eleven lawsuits to be filed prior to November 1, 2007 and another five lawsuits to be filed after November 1, 2007. *See* p. 38, *infra.*

at the relevant time. *See Creighton,* 438 U.S. at 639-640 ("the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right").

In the instant case, Mayor Amicone is alleged to have personally participated in two separate acts in violation of Plaintiffs' First and/or Fourteenth Amendment rights. With regard to Richard Blassberg ("Blassberg") and the "Readers," the claim is that Mayor Amicone personally ordered the removal of *Guardian* news boxes, thus curtailing Blassberg's right to publish and distribute his paper in Yonkers and the rights of the "Readers" to obtain and read the newspaper of their choice. With regard to the "Employees," the claim is that Mayor Amicone personally ordered that they be issued summonses for hand distributing the *Guardian* and thus infringed on their right to distribute the paper.

Mayor Amicone is entitled to qualified immunity on the news box claim because, as noted above, Plaintiffs did not establish through admissible evidence that Mayor Amicone personally participated in a decision to have the boxes removed. Plaintiffs, accordingly, have not made out a violation of a First Amendment or Fourteenth Amendment right as to Mayor Amicone. Moreover, Commissioner Liszewski testified that the Mayor told him "there were two boxes that were on the steps of the Will Library . . . impeding the right of way. And he asked [him] to have it checked out." *See* Belowich Dec., Ex. E at 64:20-64:23. Certainly, reasonably competent public officials could disagree as to whether asking the Public Works Department to investigate a condition impeding a right of way on municipal property violated any of the Plaintiffs' constitutional rights.

This same reasoning applies to the Employees' claims. The Mayor's motion to dismiss the Employees' claims on qualified immunity grounds was denied at the summary judgment stage based solely upon the "unlikely story" of Cesar Castillo, who testified at his deposition that he saw Mayor Amicone walk out onto the steps of City Hall to encourage officers issuing summonses. *See* Belowich Dec., Ex. D, at 9:13-9:22. Plaintiffs did not call Mr. Castillo at trial and the jury never heard his deposition testimony. In the absence of any evidence that Mayor Amicone individually participated in the decision to issue summonses to individuals distributing the *Guardian*, Plaintiffs did not establish a constitutional violation as to the Mayor.

Even assuming Mayor Amicone had some personal involvement in the issuance of the summonses during the relevant time, Mayor Amicone could have objectively believed that doing so did not violate clearly established law in light of Section 100-35 of the Yonkers City Code. Section 100-35 provides, in relevant part: "No person shall distribute, hand out or cast about any card, circular, pamphlet or printed matter within any park or upon any public place." Yonkers City Code § 100-35. During the summer of 2007, as this Court recognized, no Court had ruled upon the constitutionality of the provision. *See* Belowich Dec., Ex. J at 152:1-152:11. A statute is presumed constitutional until a court rules otherwise. *See Heller v. Doe,* 509 U.S. 312, 320 (1993). Hence a reasonable official, in the position of Mayor Amicone in July and August 2007, could have reasonably believed that issuing a summons on the basis of Section 100-35 would not violate a person's First Amendment rights. At the very least, competent officials could have disagreed about the legality of doing so. Indeed, a contrary interpretation would imperil public officials seeking enforcement of statutes, as they may be subjected to punitive damages if they guess wrong on the constitutionality of the statute. Furthermore, it is not even alleged that the Mayor participated in making any distinctions between various publications in connection with

the issuance of any tickets.  Mayor Amicone is therefore entitled to qualified immunity from suit, and on this basis is entitled to judgment as a matter of law.

**III.      THE TRIAL COURT INAPPROPRIATELY ADMITTED
HEARSAY TESTIMONY AGAINST MAYOR AMICONE**

Alternatively, Mayor Amicone is entitled to a new trial on the issue of punitive damages because the Court failed to protect his Due Process rights.  This Court erred in repeatedly allowing, over objection, witness after witness to testify to the content of conversations that each witness had with other individuals regarding their collective and speculative arguments as to why the *Guardian* boxes were removed.  Offering such testimony, Plaintiffs cleverly but erroneously swayed the Court that the testimony was not being offered for the truth of the matter asserted, but rather for the fact that the witness was told the testimony, and that upon hearing it the witness experienced emotional distress.  The rationale was that such testimony could be offered not for the truth of the matter asserted (why the *Guardian* boxes were removed), but to satisfy each Plaintiffs' burden to corroborate their individual claims for emotional distress when they were unable to produce any records, receipts or other physical evidence to substantiate their claims.

The hearsay testimony was not admitted for the purpose proffered by Plaintiffs and the admission of this testimony caused substantial prejudice to Mayor Amicone.  Once admitted, this hearsay testimony was repeated over and over to the jury and was then utilized by Plaintiffs to incite the passions and prejudices of the jury.  The improper admission of this hearsay testimony incited the jury and led to the excessive punitive award against the Mayor.  Plaintiffs did not sustain their burden of proof of emotional injuries and used this unfair admission of hearsay testimony improperly.  Plaintiffs' claims should therefore be dismissed as a matter of law.  At a minimum, a new trial on punitive damages is warranted, as a new trial on punitive damages is the only way to remove the taint of the unfair submission of the hearsay testimony.

### A.   Hearsay Testimony Cannot Be Used To Satisfy Plaintiffs' Burden To Corroborate Their Emotional Distress Claims

This Court correctly ruled that a plaintiff in a Section 1983 claim alleging emotional distress must corroborate that claim through the admission of competent evidence of the injury allegedly sustained. *See Patrolmen's Benevolent Assoc. of the City of New York v. The City of New York,* 310 F.3d 43 (2d Cir. 2002). When addressing a claim for emotional distress caused by an alleged Section 1983 violation, the Circuit Court stated: "A plaintiff's subjective testimony, standing alone, is generally insufficient to sustain an award of emotional distress damages." *Id.* at 55. "Rather, the plaintiff's testimony of emotional injury must be substantiated by other evidence that such an injury occurred, such as the testimony of witnesses to the plaintiff's distress, or the objective circumstances of the violation itself." *Id.*

As in all damage awards, proof of emotional distress damages, the court noted, "'must be supported by competent evidence concerning the injury.'" *Id.* (quoting *Carey v. Piphus,* 435 U.S. 247, 264 n. 20 (1978)). However, hearsay testimony may not be used to establish corroboration of emotional distress damages since it does not qualify as "competent" evidence. Generally, "competent" evidence refers only to evidence that is admissible on its own and sufficient to carry a party's burden of proof on any particular issue. The Second Circuit has previously held that hearsay testimony cannot be considered "competent" evidence. *See Sarno v. Douglas Eilliman-Gibbons & Ives, Inc.,* 183 F.3d 155, 160 (2d Cir. 1999). *See also Boehner v. Heise,* 2010 U.S. Dist. LEXIS 83800, at *41 (S.D.N.Y. 2010) (testimony at issue was "hearsay, and thus not competent evidence").

In this instance, Plaintiffs failed to offer any competent evidence to support their claims of emotional distress. The only evidence that Plaintiffs offered to support these claims was hearsay testimony that was inappropriately admitted into evidence for this purpose. Without

competent evidence to support their allegations of emotional distress, Plaintiffs' claims fail as a matter of law due to the absence of damages and should be dismissed. Without predicate tort damages, there simply is no right to punitive damages. To remove the unfair taint stemming from the admission of the hearsay testimony, Mayor Amicone should be granted a new trial on the issue of punitive damages.

**B.     The State Of Mind Exception Does Not Apply When Testimony Is Offered To Prove The Ultimate Issue**

The state of mind exception to the hearsay rule allows introduction of otherwise hearsay evidence to prove not the truth of the matter contained in the statement, but rather the fact that the statement was made and observed by the witness. The statement then becomes relevant to demonstrate how it affected the witness. However, where a hearsay statement is not relevant to a witness' statement of mind, but rather is relevant to the ultimate issue in the case, it may not be admitted under this rule. *See People v. Reynoso,* 73 N.Y.816, 819, 537 N.Y.S.2d 113, 114 (1988) (where a statement offered under the state of mind exception had no relevance other than "to prove the truth of the matter asserted... it was inadmissible hearsay"). *See also Shady Records, Inc. v. Source Enterprises, Inc.,* 2004 U.S. Dist. LEXIS 26143, at *22 (S.D.N.Y. 2005) (hearsay testimony offered for the truth, rather than for its affect on the declarant's state of mind, deemed insufficient to create a fact issue to avoid summary judgment).

Many of the Plaintiffs went beyond testifying that that they heard a certain statement and, as a result, suffered some kind of emotional response. Rather, the Plaintiffs testified repeatedly, over counsel's objection, that they heard or were told that Mayor Amicone violated their rights, and as a result, they felt violated or otherwise damaged. *See* Belowich Dec., Ex. E at 138:9-139:9, 143:14-144:7, 173:23-175:16; Ex. F at 190:6-191:20, 285:10-287:21, 302:24-305:17, 324:17-326:23, 355:14-357:11, 372:7-373:8. Whether Mayor Amicone personally participated

in a violation of any of the Plaintiffs' rights, however, was one of the ultimate issues to be decided in the trial. Plaintiffs' burden was not met by the inadmissible testimony, which neither established damages nor proved Mayor Amicone's direct involvement in the alleged incident. Accordingly, it was error to permit Plaintiffs to introduce hearsay testimony as to the Mayor's involvement where, as was the case, none of them personally observed the Mayor do anything.

### C.    The Cumulative Impact Of The Hearsay Testimony Was Highly Prejudicial To Mayor Amicone

The Court erred by overlooking the cumulative damage to Mayor Amicone caused by allowing the jury to hear such testimony repeatedly. *See* Fed. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury"). The Court instructed the jury on several occasions that the elicited testimony was not being introduced for the truth of the matter asserted and was only to be considered by the jury to evaluate the effect that the hearsay statement may have had on the specific Plaintiff. But after hearing Plaintiff after Plaintiff testify as to the content of such hearsay statements (*i.e.,* "the Mayor violated my rights"), it is unreasonable to assume that the jury could parse precisely the hearsay statements made by the Plaintiffs. This inadmissible hearsay testimony was so pervasive as to become part of the very fabric of the case and could no longer be separated from admissible testimony that was properly offered for its truthfulness.

Indeed, the Court, when repeating an inartful question posed by Plaintiffs' counsel, appeared to the jury to have adopted (over the objection of Mayor Amicone's counsel) the truthfulness of the hearsay testimony into the question. During the questioning of Chandra Sookdeo, one of the "Readers," the following exchange occurred:

| Q: | Were you more upset about your inability to read the paper or the fact that your rights were violated? |
| BELOWICH: | **Objection** |
| A: | I think my rights were violated. |
| COURT: | Overruled.  And when you see Mr. Belowich object, you have to wait for me to make a ruling because depending on what I say, you may or may not be permitted to answer. |
| A. | Yes. |
| COURT: | The objection is overruled. |
| Q: | Can you answer the question. |
| A: | Could you repeat the question, please. |
| Q: | I can try. |
| COURT: | Were you more upset about your inability to read the paper **or the fact that your rights were violated**? |

Belowich Dec., Ex. F at 193:22-194:13 (emphasis added).

This exchange highlights the unrealistic expectation that was placed upon the jury and its ability to repeatedly hear inadmissible and wholly unsubstantiated hearsay testimony that Mayor Amicone somehow "caused the *Guardian* boxes to be removed" without falling into the trap of believing that these statements were in fact true.  If the Court repeated a question that seemed to assume the truthfulness of these statements, how could the jury reasonably be expected to do so?  The fact is -- the resulting taint caused by the admission of the hearsay testimony simply could not be removed by the Court's instructions.  Mayor Amicone should therefore be granted a new trial on the issue of punitive damages.

### D.    The Hearsay Testimony Allowed The Plaintiffs To Incite The Jury To Award Punitive Damages Against Mayor Amicone

The introduction of this repeated hearsay testimony, buttressed (however unintentionally) by the question repeated by the Court, provided Plaintiffs with a platform upon which to argue for the imposition of punitive damages without any evidence directly linking Mayor Amicone to

the removal of the boxes or the issuance of summonses.  Plaintiffs were able to inflame the

jurors' passions and prejudices against the Mayor and to convince the jurors to impose punitive

damages against the Mayor in a truly excessive and unprecedented amount by repeatedly drilling

into the jurors the inadmissible and unsupported hearsay testimony that Mayor Amicone "caused

the *Guardian* boxes to be removed."  Not surprisingly, in his closing argument, Plaintiffs'

counsel adopted the hearsay testimony as true and used it to argue that punitive damages should

be imposed against the Mayor.  In summation, Plaintiffs' counsel made numerous statements

which required the jury to accept the Plaintiffs' hearsay testimony for its truth.  These statements

were undoubtedly calculated to inflame the jury (and no doubt did), and to bolster Plaintiffs'

request for punitive damages.  These statements included the following:

> Perhaps the readers were the ones who were damaged the most and not the least
> by the Mayor's actions.

Belowich Dec., Ex. I at 62:4-62:5 (emphasis added).

> If the First Amendment means anything, ladies and gentlemen, it means that the
> state or here the Mayor and the city has no business telling a man or a woman
> sitting alone in his or her house what or she can't read.  Mayor Amicone through
> the police department, the Department of Public Works and its subordinate
> suspended the First Amendment rights of all of the citizens of Yonkers.

*Id.* at 82:12-82:18 (emphasis added).

> What is the value, the cost, the award to be given for those who suffered from
> Mayor Amicone's concerted, coordinated, citywide attack on the First
> Amendment to the Constitution?  The Constitution that hundreds of thousands if
> not millions have sacrificed life and limb to protect and defend.  We have, or in
> the summer of 2007 had soldiers overseas fighting to protect democracy, to
> preserve our way of life, our Constitution.  Incredibly back here in Yonkers, New
> York, the city that destroyed 56 propaganda machines, 56 blue boxes.

*Id.* at 83:8-83:17 (emphasis added).

> Imagine what it would be like to come out of your house one day and find that
> Governor Patterson has confiscated all of the New York Times' distribution
> trucks....You don't have to imagine what it would be like because you saw and

heard what it was like last week.  <u>Without punitive damages in this case, there's nothing to dissuade Mayor Amicone</u>, the City of Yonkers, or anyone else for that matter <u>[from]  doing  what  was  done  here</u>....In  assessing  an  amount  of  punitive damages, consider the amount of people affected, writers, distributors, readers, those who placed ads in the paper.

*Id.* at 86:4-86:7, 86:13-86:17 and 86:21-86:23 (emphasis added).

The Mayor resorted to self-help, <u>had city workers slash like a sword through the Constitution</u> only to destroy the Guardian, its boxes, its papers and injure the plaintiffs in the process.

*Id.* at 88:24-89:2 (emphasis added).

The hearsay testimony admitted at trial had a two-fold prejudicial effect:  (i) it improperly allowed Plaintiffs to corroborate their claims of emotional distress when they lacked any competent evidence to support such claims; and (ii) the cumulative effect of this repeated hearsay testimony made it impossible for the jury to separate the purpose for which they were instructed that the testimony was being offered, on the one hand, from the truth of the content of the statement, on the other (A difficult distinction under the best of circumstances, but impossible here).  This hearsay testimony, which the jury reasonably could believe was adopted by the Court for its truthfulness, provided the basis for Plaintiffs to incite the passions and prejudices of the jury and resulted in the excessive punitive damages award against Mayor Amicone.  For these reasons, the Court should strike the hearsay testimony and dismiss Plaintiffs' claims as a matter of law, or in the alternative grant Mayor Amicone a new trial on the issue of punitive damages.

## IV.    THE  MISSING  WITNESS  CHARGE  WAS  LEGALLY  INCORRECT  AND UNFAIRLY PREJUDICED THE JURY AGAINST MAYOR AMICONE

"[W]hen a witness is equally available to both sides, the failure to produce is open to an inference *against both parties*.  No instruction is necessary where the unpresented testimony would be merely cumulative."  *Martinez v. The Port Authority of New York and New Jersey,*

2005 U.S. Dist. LEXIS 19141, at *35 (S.D.N.Y. 2005) (citing *United States v. Torres*, 845 F.2d 1165, 1169 (2d Cir. 1988)) (emphasis in original). "Courts have been reluctant to find a witness practically unavailable when it appears that the defense has no real interest in calling the witness to the stand, but merely is engaged in a form of gamesmanship in an effort to obtain a missing witness charge." *Id.* at *36 (citing *Torres, supra* at 1170-71). *See also United States v. Erb,* 543 F.2d 438, 444 (2d Cir. 1976).

Here, Mayor Amicone was equally available to be called as a witness by any party during the trial and, in fact, did testify, on both direct and cross-examination, in reference to his counterclaim and third-party claim for defamation. Plaintiffs made no effort to call Mayor Amicone as a witness or read his deposition testimony during the presentation of their direct case or in rebuttal,[3] and did not even attempt to question the Mayor concerning their claims when he was actually on the witness stand. Accordingly, the Court should have given no missing witness charge, or a missing witness charge instructing that Mayor Amicone's absence was open to an adverse inference against *both* parties. However, the Court gave a missing witness charge that permitted an inference only against Mayor Amicone. Plaintiffs' failure to call him as a witness and then requesting a missing witness charge merely exemplifies the "aura of gamesmanship" that frequently accompanies requests for missing witness charges. *See United States v. Gaskin*, 364 F.3d 438, 463 (2d Cir. 2004).

Aside from the issue of whether the Court should have given a missing witness charge at all, in any such charge, the Court should have advised the jury that any adverse inference should be drawn *only* "if the witness was unavailable to the other side or the testimony would *not* be cumulative." *See United States v. Ouimette*, 798 F.2d 47, 49 (2d Cir. 1986). However, the Court

---

[3] Plaintiffs did not call Mayor Amicone as a witness even though they clearly had the ability to do so. They subpoenaed four City employees to testify (John Liszewski, Robert Greco, Charles Gardner and David Simpson) and easily could have subpoenaed the Mayor.

did not so advise the jury. Rather, concerning Mayor Amicone, the Court charged: "If you find that he had knowledge of important facts which he failed to provide, you are permitted, but not required, to infer that the withheld information would have been unfavorable to him." Belowich Dec., Ex. I at 133:22-25.

As to the City, however, the Court provided a materially different charge: "With respect to the City of Yonkers, you may but are not required to draw a similar inference . . .   In deciding whether to draw this inference, you should consider whether Mr. Amicone's testimony would merely have repeated other testimony and evidence already before you, and whether the City of Yonkers had a reason for not calling Mr. Amicone which was explained to your satisfaction." Belowich Dec., Ex. I at 134:1-10.

The dramatic difference in the missing witness instructions relating to the claims against the Mayor individually as opposed to the City violated the Mayor's Equal Protection and Due Process rights, was highly prejudicial to Mayor Amicone and served to discredit the jury's view of Mayor Amicone. The prejudice to Mayor Amicone in first granting a missing witness charge, and second, in failing to advise the jury that it should only consider drawing a negative inference if Mayor Amicone's testimony was not available to both sides or not cumulative, was apparent from Plaintiffs' summation and the resulting punitive damages award. Plaintiffs' counsel seized this opportunity to argue:

> When it comes to Mayor Amicone, ladies and gentlemen, the evidence in the record reveals that in the first place he came in here and failed to controvert any accusations against him or provide any evidence . . . that he had nothing to do with the wholesale violation of plaintiffs' First Amendment rights. . . .
>
> *     *     *     *     *
>
> And the Mayor didn't stand up and admit that he was responsible for taking the boxes, although his silence came pretty close. Having the opportunity to tell you what happened, he had nothing to do with the destruction of the boxes, he sat there and said nothing.
>
> *     *     *     *     *

18

Mr. Amicone took the stand to convince you that he's been defamed, to convince you to compensate him, but said nothing about the plaintiff's allegations. And from this you can and should draw a negative inference.

Belowich Dec., Ex. I at 61:6-51:11, 60:18-60:19, 85:25-86:3.

Importantly, the jury was not instructed, and hence did not know, that it should not draw any inference against Mayor Amicone if his testimony was equally available to all parties or if it would have been merely cumulative. Further, the jury did not know that it should consider the explanation provided by the Mayor in summation for not having testified relating to Plaintiffs' claims (*see* Belowich Dec., Ex. I at 31:18-32:18). The Court advised the jury that it could consider any such explanation as to the City, but not the Mayor. Specifically, the Court advised the jury: "In deciding whether to draw this inference, you should consider… whether the City of Yonkers had a reason for not calling Mr. Amicone which was explained to your satisfaction." *See* Belowich Dec., Ex. A at pp. 25-26 (emphasis added). This erroneous instruction, combined with the improper admission of inadmissible hearsay evidence, provided Plaintiffs with a basis to incite the jury against the Mayor and unfairly resulted in the excessive punitive damages award. For this reason, the Court should order a new trial on the issue of whether punitive damages are warranted against Mayor Amicone based solely on admissible evidence.

## V.    THE JURY'S AWARD OF PUNITIVE DAMAGES SHOULD BE SET ASIDE AS A MATTER OF LAW

Mayor Amicone is entitled to judgment as a matter of law on Plaintiffs' claim for punitive damages. A motion for judgment as a matter of law should be granted where, as here, "'the evidence produced at trial demonstrates (1) such a complete absence of support for a verdict that a jury's factual findings could only have been the result of sheer surmise and conjecture; or (2) such an overwhelming showing of facts favoring the movant that reasonable

and fair-minded persons could not arrive at a verdict against that party." *Gonzalez v. Bratton*, 147 F. Supp. 2d 180, 188 (S.D.N.Y. 2001) (citing Fed. R. Civ. P. 50(b)). *See also Morales v. City of New York*, 2001 WL 8594, *2 (S.D.N.Y. 2001).

In this case, the absence of evidence of Mayor Amicone's personal involvement shows that the jury's finding could only have been the result of sheer surmise and conjecture, and that the award of punitive damages was fueled by passion and prejudice. This Court instructed the jury that it could "award a Plaintiff punitive damages with respect to his or her claim or claims against Mr. Amicone if [it] find that the acts of Mr. Amicone with respect to that Plaintiff were done maliciously or wantonly." *See* Belowich Dec., Ex. A at p. 13 (emphasis added). The Court also instructed the jury:

> An act or failure to act is maliciously done if it is prompted by ill will or spite towards the injured person. An act or failure to act is wanton if it is done in a reckless or callous disregard of, or indifference to, the rights of the injured person. The Plaintiffs have the burden of proving, by a preponderance of the evidence, that Mr. Amicone acted maliciously or wantonly with regard to their rights.

*Id.* (emphasis added).

The jury ignored these instructions and awarded a shocking $8,000,000 in punitive damages against Mayor Amicone despite the fact that Plaintiffs failed to establish by a preponderance of the evidence that Mayor Amicone's conduct was "prompted by ill will or spite towards" any of the Plaintiffs, or that Mayor Amicone acted "in a reckless or callous disregard of, or indifference to, the rights of" the Plaintiffs.[4] Further, and contrary to the Court's

---

[4] Application of the preponderance standard to the punitive damages issue violates Mayor Amicone's fundamental due process rights. The New York Court of Appeals has not ruled on whether punitive damages should be considered on a clear and convincing evidence standard as opposed to a preponderance standard. We note, however, that 34 out of 50 states apply a clear or convincing standard to the question of whether punitive damages should be awarded in a civil case. In fact, only six states (Connecticut, Louisiana, New Mexico, Vermont, Virginia and West Virginia) and the District of Columbia, have unambiguously selected a lower, preponderance of the evidence standard. *See* Wilson, Elser, Moskowitz, Edelman & Dicker LLP, 50-state review of punitive damages (http://win/sites/library/All%20State%20Survey/Wilson%20Elser%20Surveys/Punitive%20Damages%202008.pdf).

instructions, there was no individualized evaluation of the Mayor's actions *vis-à-vis* each Plaintiff, or of whether the Mayor was prompted by ill will or spite towards each specific Plaintiff. Rather than carefully applying the law to the facts, the jury improperly latched onto an unconstitutionally excessive number, and simply divided it by seventeen.

## VI.    MAYOR AMICONE IS ENTITLED TO A NEW TRIAL OR REDUCTION OF THE PUNITIVE DAMAGES AWARD

In the event the Court denies Mayor Amicone's motion to set aside the award of punitive damages, as a matter of law and consistent with Due Process and Equal Protection, Mayor Amicone is entitled to a new trial on the issue of whether punitive damages are warranted, and if so in what amount. If a new trial is not granted, this Court has an independent duty to remit the punitive damage award to an amount that is not unconstitutionally excessive.

### A.    The Punitive Damage Award is Unconstitutional

The Supreme Court has cautioned that considerable care must be taken to protect a defendant's constitutional rights when punitive damages are at issue. *See, e.g., BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996) (establishing guideposts for post-verdict review to determine whether a punitive damage verdict exceeds constitutional limits); *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424 (2001) (requiring independent *de novo* judicial determination of the constitutionality of a punitive damage verdict and prohibiting judicial deference to the jury's determination of the amount of punitive damages—punishment must be based on the conduct that harmed plaintiff, and "not for being an unsavory individual or business"); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) (prohibiting assessment of punitive damages for an alleged generalized course of conduct and requiring punitive damages to be based upon defendant's conduct that allegedly injured plaintiff).

Due process requires a fair trial procedure in which unambiguous laws are applied equally to all parties. *See Roberts v. United States Jaycees*, 468 U.S. 609, 629 (1984) ("The requirement that government articulate its aims with a reasonable degree of clarity ensures that state power will be exercised only on behalf of policies reflecting an authoritative choice among competing social values, reduces the danger of caprice and discrimination in the administration of the laws, enables individuals to conform their conduct to the requirements of law, and permits meaningful judicial review") (internal citations omitted); *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) ("A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application") (footnote omitted).

This case is replete with examples of unequal application of evidentiary rules and fundamentally unfair treatment of Mayor Amicone, including: (i) applying a novel interpretation of municipal immunity; (ii) providing a missing witness charge even though the witness was available and testified on other issues; (iii) permitting a series of witnesses to present hearsay testimony, effectively allowing Plaintiffs' assertion of relevance to trump Mayor Amicone's constitutional right to a fair trial; (iv) providing confusing and misleading instructions concerning the hearsay testimony; and (v) repeating a question directly to a witness which assumed "the fact that your rights were violated," which led the jurors to mistakenly believe that the Court itself may have reached the same conclusion. All of these problems, and any or all of them in combination, tainted the jury, and resulted in a punitive damage award that is unconstitutionally excessive and in violation of Mayor Amicone's Due Process and Equal Protection rights. As discussed more fully below, if the punitive damage award is not vacated,

this Court should order a new trial on the issue of punitive damages, as the taint of the verdict cannot be removed by reduction or remittitur of the punitive damage award.

**B.     The Punitive Damage Award is Excessive**

This Court should order a new trial. It is the only way to remove the unfair taint of the excessive punitive award. If not, this Court should use its discretion to remit the punitive damages award to reflect a 1:1 punitive to compensatory damages ratio.

It is well settled that a trial judge has considerable discretion under Rule 59 of the Federal Rules of Civil Procedure to overturn excessive awards of punitive damages and "order a new trial, a new trial limited to damages, or, under the practice of remittitur,... condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996). *See also Gonzalez*, 147 F. Supp. 2d at 189 (citing *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998)). "Before a court orders a plaintiff to make this choice, it must first determine whether the award is excessive." *Id.*

A punitive damages award is excessive where, as here, "the amount is so high as to shock the judicial conscience and constitute a denial of justice." *See Lee*, 101 F.3d at 808. *See also DiSorbo v. Hoy*, 343 F.3d 172, 186 (2d Cir. 2003) ("the standard for review of an award of punitive damages under § 1983 considers whether the award is so high as to shock the judicial conscience and constitute a denial of justice").

The Supreme Court has identified three 'guideposts' for determining *de novo* without any deference to the amount awarded by the jury whether a punitive damages award is excessive: "(1) the degree of reprehensibility; (2) the disparity between the harm or potential harm and the punitive damages award; and (3) the difference between the remedy and the civil penalties authorized or imposed in comparable cases." *DiSorbo*, 343 F.3d at 186 (citing *Gore*, 517 U.S. at

23

443). *See also State Farm*, 538 U.S. at 418 (2003); *Exxon Shipping Co. v.Baker*, 128 S.Ct. 2605, 2626 (2008). The punitive damage award is excessive under all three of the guideposts.

### 1.    The First *Gore* Guidepost: Reprehensibility

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *DiSorbo*, 343 F.3d at 186 (citing *Gore*, 517 U.S. at 575). The Supreme Court has instructed courts to consider the following factors in determining the degree of reprehensibility of a defendant's conduct: (1) whether the harm caused was physical as opposed to economic; (2) whether the conduct evidenced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct had financial vulnerability; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit or whether it was a mere accident. *See State Farm*, 538 U.S. at 419 (citing *Gore*, 517 U.S. at 576-77). "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id.*

The misconduct alleged in this case cannot be considered "reprehensible" under the standard articulated above. First, Plaintiffs never proved (or even alleged) significant physical injuries. At most, they provided vague, though suspiciously similar, testimony about gastro-intestinal discomfort that was not corroborated by so much as a receipt for an over-the-counter remedy, much less a visit to the doctor. Indeed, for sixteen of the Plaintiffs, the jury was so impressed by the severity of their injuries that they awarded them damages in the amount of $1 each, and in so doing essentially rejected their claimed injuries. *See* Belowich Dec., Ex. B at p. 4; Ex. C. Second, the misconduct alleged did not evidence an indifference to or reckless

24

disregard of the health or safety of others.  Third, the target of the conduct (to the extent there was a target) did not have financial vulnerability (none of the Plaintiffs claimed that they incurred any economic loss as result of the alleged misconduct).  Fourth, Plaintiffs failed to establish that the misconduct alleged (*i.e.*, that Mayor Amicone "directed" the removal of news boxes and the issuance of summonses) involved repeated actions.  Fifth, Plaintiffs failed to establish that the misconduct alleged was the result of intentional malice, trickery or deceit on the part of Mayor Amicone.  *See Leather v. Ten Ecky,* 97 F. Supp.2d 482 (S.D.N.Y. 2000).  Finally, as noted above, there was no direct evidence that Mayor Amicone personally directed the removal of news boxes or the issuance of summonses.  In this context, any amount of punitive damages against the Mayor would be excessive.

### 2.   The Second *Gore* Guidepost: Disparity Between Actual Harm and Punitive Damages Award

"In considering the ratio between a punitive damage award and the actual harm inflicted, the second *Gore* guidepost, 'the proper inquiry is whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually occurred.'"  *Lee,* 101 F.3d at 810 (quoting *Gore,* 517 U.S. at 581).  "This consideration requires courts to 'ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered.'"  *DiSorbo,* 343 F.3d at 187 (quoting *State Farm,* 538 U.S. at 426).  The Supreme Court in *State Farm* explained:

> Our jurisprudence and the principles it has now established demonstrate... that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages... will satisfy due process.  In *Haslip,* in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety... We cited that 4-to-1 ratio again in *Gore...*  While these ratios are not binding, they are instructive.  They demonstrate what should be obvious:

> Single-digit multipliers are more likely to comport with due process, while still
> achieving the State's goals of deterrence and retribution, than awards with ratios
> in range of 500 to 1... or, in this case, of 145 to 1.

*State Farm*, 538 U.S. at 424 (emphasis added).

Notably, the ratio in this case ranges from 313:1 to 470,588:1, well in excess of the 145:1

ratio found unacceptable in *State Farm. Id.* More significantly, this is a case where federal law

applies. The Supreme Court recently addressed the ratio issue in the context of federal common

law, albeit in a maritime case, and expressly adopted a 1:1 ratio of punitive to compensatory

damages. *See Exxon Shipping, supra,* 128 S.Ct. 2605 (2008). The Supreme Court evaluated and

rejected 3:1 and 4:1 ratios as excessive, stating:

> Accordingly, given the need to protect against the possibility (and the disruptive
> cost to the legal system) of awards that are unpredictable and unnecessary, either
> for deterrence or for measured retribution, we consider that a 1:1 ratio, which is
> above the median award, is a fair upper limit in such maritime cases.

*Exxon Shipping*, 128 S.Ct. at 2632-33.

The punitive damages award in this case is unconstitutionally excessive under the 1:1

ratio, or even the single-digit ratio articulated years ago in *State Farm.* The ratio between the

punitive damages awarded to Blassberg ($470,588.20) and the amount of Blassberg's "actual"

damages ($1,500)[5] is an astounding and unconstitutional **313 to 1**. *See* Belowich Dec., Ex. B at

p. 4; Ex. C. Furthermore, this ratio is excessive when compared with punitive damage awards in

other Section 1983 First Amendment cases. *See Shatner v. Page*, 2009 WL 260788, *34 (S.D.

Ill. 2009) ("After a thorough review of the case law regarding punitive damages in Section 1983

---

[5] Blassberg was awarded $1,500 against Mayor Amicone and $1,500 against the City of Yonkers. *See* Belowich Dec., Ex. B at p. 4; Ex. C. The fact that Blassberg was awarded any compensatory damages is shocking. Blassberg testified at his deposition that he did not exhibit any physical symptoms of emotional upset. *See* Belowich Dec., Ex. F at 249:18-250:13. After sitting in the back of the courtroom and listening to other plaintiffs testify for almost two days, Blassberg claimed for the first time that he suffered diarrhea for more than two weeks as a result of Defendants' conduct. *See id.* at 249:1-250:17. This testimony is simply not credible.

First Amendment cases, the Court finds generally that the case law does not support an award of [a] substantial amount of punitive damages in cases such as this with minimal compensatory damages"); *Stack v. Jaffe*, 306 F. Supp. 2d 137, 141-42 (D. Conn. 2003) ("[T]here are but a few cases in which a de minimus award of compensatory damages permits a comparatively enormous award of punitive damages"). The amount of punitive damages awarded to Blassberg is unconstitutionally excessive under the ratio guidepost.

The amount of punitive damages awarded to the "Employees" and "Readers" ($470,588.20 each) based on $1 each in nominal damages, also is unconstitutionally excessive. The Second Circuit has held that a total award of $10,000 in punitive damages in a case such as this, where the plaintiff was awarded only $1 in nominal damages, "approaches the limits of what [would be deemed] consistent with constitutional constraints." *See Provost v. City of Newburgh*, 262 F.3d 146, 164 (2d Cir. 2001). Notably, in *DeLeon v. Little*, 1999 WL 1490299, *7 (D. Conn. 1999), the court reduced a punitive damages award to $7,500 and explained: "The jury's determination that the plaintiff suffered no injury for which compensation should be awarded bolsters the conclusion that the infringement on her First Amendment rights was not so reprehensible as to justify a substantial award of punitive damages." *Id.* Thus, under the second *Gore* guidepost, the punitive damage award is unconstitutionally excessive.

### 3. The Third *Gore* Guidepost: Comparison to Awards in Comparable Cases

"The third guidepost in *Gore* is the disparity between the punitive damages award and 'civil penalties authorized or imposed in comparable cases.'" *State Farm*, 538 U.S. at 428 (quoting *Gore*, 517 U.S. at 575). "When penalties for comparable misconduct are much slighter than a punitive damages award, it may be said that the tortfeasor lacked 'fair notice' that the wrongful conduct could entail a substantial punitive award." *Lee*, 101 F.3d at 811 (citing *Gore*,

27

517 U.S. at 583); *Fabri v. United Technologies Int'l, Inc.*, 387 F.3d 109, 126-27 (2d Cir. 2009) (vacating a punitive damages award of $500,000 on fair notice grounds).   Mayor Amicone clearly lacked "fair notice" that the conduct alleged could result in an unprecedented award of $8,000,000 in punitive damages.[6]

There are no cases which support an award of $8,000,000 in punitive damages for an alleged First Amendment or Equal Protection violation. Punitive damages have been awarded in § 1983 cases.  However, the vast majority of those cases involve allegations of police brutality. In those cases, excessive awards of punitive damages have been substantially reduced even when significant physical harm was present.  *See, e.g.*, *Lee*, 101 F.3d at 812 ($200,000 award of punitive damages reduced to $75,000 where the defendant police officer hit the plaintiff, who was handcuffed, eight or nine times in the head with his police baton and knocked him unconscious); *DiSorbo*, 343 F.3d at 187 ($1,275,000 award of punitive damages reduced to $75,000 where the defendant police officer "violently slammed [the plaintiff] against the wall, choked her to the point where she began to lose vision, pushed her to the ground and struck her while she was on the ground"); *Mathie v. Fries*, 121 F.3d 808, 816-17 (2d Cir. 1997) ($500,000 award of punitive damages reduced to $200,000 where the defendant corrections officer forcibly sodomized the plaintiff inmate).

None of the Plaintiffs in this case suffered physical or economic damages as a result of Mayor Amicone's alleged misconduct. The Employees and Readers did not even suffer emotional damages. *See* Belowich Dec., Ex. B at p. 4.  Yet, the jury inexplicably awarded the Plaintiffs a total $8,000,000 in punitive damages -- 40 times more than the $200,000 award against a corrections officer in *Fries* who forcibly sodomized an inmate.

---

[6]  By way of comparison, Section 100-35 of the City Code is considered a Class III offense, subject to a criminal fine of not more than $250.  Code of the City of Yonkers, Section 1-21 A. (3) (a).

While courts have awarded punitive damages in cases alleging First Amendment violations, most of those cases involve First Amendment retaliation claims asserted against employers, police officers and/or corrections officers.   There are but a handful of First Amendment cases that are comparable to this one.  Those cases (which are analyzed below) include *Bisignano v. Korff*, 2001 WL 1772172 (S.D.N.Y. 2001); *Spelman v. Netzel*, 1995 WL 290392 (N.D. Ill. 1995);[7] *Stack*, 306 F. Supp. 2d 137, *supra*; *DeLeon*, 1999 WL 1490299, *supra*; and *Monteiro v. City of Elizabeth*, 436 F.3d 397 (3d Cir. 2006).

The plaintiff in *Bisignano* filed a lawsuit against the Mayor of Port Chester for the violation of his First Amendment right of association.  *See Bisignano*, 2001 WL 1772172 at *1. After a three-day jury trial, the plaintiff was awarded $20,000 in compensatory damages and $160,000 in punitive damages against the Mayor.  *See id.*  Judge Brieant set aside the 8:1 punitive damage award in its entirety, finding that "the violation, while serious, [did] not rise to the 'high degree of culpability' required for an award of punitive damages." *Id.* at *2.  In so doing, Judge Brieant stated:

> Although punitive damages have been praised as a means of providing deterrence and just retribution... in cases where a punitive award is the product of jury passion, bias or unlimited discretion, that punitive award may embody such an extreme result that it shocks the judicial conscience.  In those cases, <u>where the jury's discretion is not exercised within reasonable constraints, but is instead the product of passion or bias, it is the duty of the Court to set aside the award.</u>
>
> \*     \*     \*     \*     \*
>
> The amount of punitive damages awarded must bear some proportion or some reasonable relationship to the harm actually incurred, as reflected in the compensatory damage award.  In this case, the $160,000 punitive damages award is clearly disproportionate to the $20,000 compensatory award... Furthermore, <u>the $160,000 punitive damages award is extremely excessive when contrasted with the punitive damages awards ranging from $1,000 to $3,000 which have been assessed against municipal officials for abuses of power in other cases.</u>

---

[7] This Court is permitted, in comparing cases under the third *Gore* guidepost, to examine cases decided by courts in other circuits.  *See Mendez-Matos v. Municipality of Guaynabo*, 557 F.3d 36, 55 (1st Cir. 2009) ("While we look first to authorities within our own circuit, we are not confined to such sources").

*Id.* at * 1-2 (emphasis added) (internal citations omitted). *See also Thomas v. iStar Financial, Inc.*, 520 F. Supp. 2d 478, 481 (S.D.N.Y. 2007) (finding that award of $1.6 million "so grossly and inexplicably exceed[ed] both the economic and emotional harm the jury found that the discrepancy raise[d] serious concern that sheer passion, guesswork, or other impermissible motives imbued... the verdict").

The plaintiff in *Spelman* alleged, among other things, that the Mayor of West Chicago, Illinois and members of the West Chicago police department conspired to deprive him of his First Amendment rights through a campaign of harassment and intimidation. *See Spelman*, 1995 WL 290392 at *1. After a jury trial, the plaintiff was awarded a total of $300,000 in compensatory damages and $1,000,000 in punitive damages for the violation of his First Amendment rights. *See id.* The trial court properly reduced the amount of the punitive damages award from $1,000,000 to $7,000, stating: "Given the evidence presented in this case, an award of no more than $3,500 each against [the two] defendants is adequate to deter future First Amendment violations." *See id.* at *6.

The plaintiff in *Stack* asserted claims against a police officer for the violation of his First Amendment rights, intentional inflection of emotional distress and defamation. *See Stack*, 306 F. Supp. 2d at 137. The jury awarded the plaintiff $2,000 in compensatory damages for all of the claims and $200,000 in punitive damages for the violation of plaintiff's First Amendment rights. *See id.* at 138. The Court reduced the amount of the award from $200,000 to $25,000. In so doing, the Court stated: "[T]here are but a few cases in which a de minimus award of compensatory damages permits a comparatively enormous award of punitive damages... [T]he $200,000 [punitive damages award] is neither reasonable nor proportionate to the amount of

actual harm to [the plaintiff] and to the general damages he recovered. Thus... the Court hereby orders remitter of $175,000..." *Id.* at 141-42 (emphasis added).

The plaintiff in *DeLeon*, an employee of the City of Hartford, asserted a First Amendment claim against her supervisor, a member of the Hartford City Council, alleging that her supervisor threatened to terminate her employment based upon her political affiliation. *See DeLeon*, 1999 WL 1490299, at *3. The jury awarded the plaintiff $1 in nominal damages and $150,000 in punitive damages. *See id.* The trial court reduced the amount of the punitive damage award from $150,000 to $7,500, explaining: "The jury's determination that the plaintiff suffered no injury for which compensation should be awarded bolsters the conclusion that the infringement on her First Amendment rights was not so reprehensible as to justify a substantial award of punitive damages." *Id.* at *7 (emphasis added).

Finally, the plaintiff in *Monteiro*, a city council member, commenced an action against the president of the city council alleging that she violated his First Amendment rights by ejecting him from a public meeting of the council and having him arrested on a disorderly persons charge on the basis of his viewpoint. *See Monteiro*, 425 F.3d at 397. The jury awarded $10,000 in compensatory damages and $750 in punitive damages upon a finding that the defendant acted recklessly and with callous indifference to the plaintiff's First Amendment rights. *See id.* at 399. The district court upheld the amount of the award and the appellate court affirmed. *See id.* Clearly, under the third *Gore* guidepost, the jury's punitive damage cannot stand.

C.    **The Amount of the Award Should be Significantly Reduced**

On the basis of these factors, and existing case law guidelines, and taking into account the proper limits of Due Process, the amount of the award should be remitted to a 1:1 ratio

between each Plaintiff's compensatory damages and the punitive damages awarded for that Plaintiff's claim.

Another indicator of the unfair excessiveness of the $8,000,000 award is a comparison of the award to the Mayor's salary. As set forth in the Yonkers City Charter, the salary of the Mayor is $156,100 annually. Yonkers City Code, § C3-3. The jury in this case awarded $8,000,000 -- over fifty-one times the Mayor's annual salary -- in punitive damages. Even assuming there was evidence of the Mayor's personal involvement in the conduct at issue -- which there is not -- Mayor Amicone had no notice that such conduct could possibly yield a penalty of 51 times his annual salary. Under these circumstances, the punitive damages award is grossly excessive and represents a miscarriage of justice. If any portion of the punitive damages award is to be upheld in this case and under these facts, this Court should at least consider an award in fair relationship to the Mayor's annual salary. A fair point of reference would be the $427.40 pro rata daily salary of the Mayor with a day's pay to each Plaintiff.

## VII.   MAYOR AMICONE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL ON HIS COUNTERCLAIM AND THIRD-PARTY CLAIM FOR DEFAMATION *PER SE*

As noted above, a motion for judgment as a matter of law should be granted where "the evidence is so overwhelming that reasonable and fair minded persons could only have reached the opposite result.'" *Ryduchowski,* 203 F.3d at 141-42 (citations omitted). In this case, there was such an overwhelming showing of facts favoring Mayor Amicone on his claim for defamation *per se* that reasonable and fair-minded persons could not possibly have arrived at a verdict against him. *See* pp. 33-40, *infra.*

In the event the Court denies Mayor Amicone's motion for judgment as a matter of law, it is respectfully submitted that a new trial should be ordered on Mayor Amicone's counterclaim

and third-party claim for defamation *per se*. "Unlike judgment as a matter of law, a new trial may be granted under FRCP 59 even if substantial evidence exists to support the jury's verdict." *Marshisotto v. City of New York*, 2007 WL 1098678, \*7 (S.D.N.Y. 2007) (citing *Song v. Ives Lab., Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992)). "Moreover, in considering a motion for a new trial, a court is 'free to weigh the evidence... and need not view it in the light most favorable to the verdict winner.'" *Id.* (quoting *Song*, 957 F.2d at 1047). *See also Meloff v. New York Ins. Co.*, 240 F.3d 138, 147 (2d Cir. 2001) (affirming order granting new trial). This analysis is particularly apt where, as here, the trial suffered from an unconstitutional taint.

The evidence presented at trial was more than sufficient to establish liability against Zherka, Blassberg and the Guardian News, Inc. (collectively, the "Counterclaim Defendants") for defamation *per se*. In order to prevail on a defamation claim, the plaintiff (or in this case, the counterclaim/third-party plaintiff) must establish: "(1) a written defamatory statement of fact regarding the plaintiff; (2) published to a third party by the defendant; (3) defendant's fault, varying in degree depending on whether the plaintiff is a private or public party; (4) falsity of the defamatory statement; and (5) injury to plaintiff." *Stern v. Cosby*, 645 F. Supp. 2d 258, 272 (S.D.N.Y. 2009) (citing *Meloff v*, 240 F.3d at 145). In cases such as this, where the statement is so egregious that it is presumed to cause serious harm, the statement is defamatory 'per se' – and the plaintiff need not prove special damages, i.e., economic or financial loss." *See id.* (citing *Sharratt v. Hickey*, 20 A.D.3d 734, 799 N.Y.S.2d 299 (3d Dept. 2005)). Mayor Amicone established each of these elements at trial.

## A.    The Statement Was Defamatory Per Se

There is no question that the statement at issue in this case (*i.e.*, that Mayor Amicone "actually frequents strip clubs" and "even had a 'lap dance' from a girl by the name of Sassy") is

defamatory *per se*.  In fact, this Court ruled at trial that the statement "tend[s] to injure Mr. Amicone in his trade, business or profession," "that [it] imputes unfitness in one's profession," and that "it was intended to injure him in his profession." *See* Belowich Dec., Ex. Ex. I at 4:1-5:5.  Accordingly, this element of Mayor Amicone's defamation claim is satisfied. *See id.*

**B.     The Statement Referred to Mayor Amicone**

As this Court properly instructed the jury, there is no dispute that the defamatory statement published in the November 1, 2007 edition of the *Guardian* "referenced" Mayor Amicone. *See* Belowich Dec., Ex. A at p. 16.  Accordingly, this element of Mayor Amicone's defamation claim is satisfied. *See id.*

**C.     The Statement Was Published**

"Publication occurs when the libelous words are read 'by someone other than the person libeled and the person making the charges.'" *Van-Go Transport Co., Inc. v. New York City Bd. of Educ.*, 971 F. Supp. 90, 102 (E.D.N.Y. 1997) (quoting *Fedrizzi v. Washingtonville Sch. Dist.*, 204 A.D.2d 267, 268, 611 N.Y.S.2d 584, 585 (2d Dept. 1994)).  "To be liable for defamation, the defendant must induce or cause publication in some fashion..." *Id.*  There is no doubt that the Counterclaim Defendants caused the defamatory statement to be published in the November 1, 2007 edition of the *Guardian*.  Blassberg (who boasted twice at trial that he "possesses a law degree") admitted at his deposition that the November 1, 2007 edition of the *Guardian* was published and distributed in municipalities throughout the County of Westchester. *See* Belowich Dec., Ex. G at 634:9-636:13.

Notwithstanding this admission, Blassberg had the audacity to testify at trial (while holding the November 1, 2007 edition of the *Guardian* in his hand) that he did not know if the

paper was "actually" published or distributed.  *See* Belowich Dec., Ex. G at 640:10-640:22.

After hearing this highly implausible testimony, the Court interjected and asked:

> COURT:    Hold on... I just have a question.  Can I see the exhibit?
>
> LOVETT:    Pardon me?
>
> COURT:    Can I see the exhibit?  What exhibit is it?
>
> BELOWICH:  Defendants' Exhibit L.
>
> COURT:    L, yeah.
>
> WITNESS:    Your Honor.
>
> COURT:    You don't know if this was published, this document?
>
> WITNESS:    I don't have -- well, <u>obviously, what I'm viewing, it would appear to have been published</u>, yes.
>
> COURT:    Okay.
>
> WITNESS:    But I was not responsible for either the distribution or the printing of it, no.
>
> COURT:    I was getting at whether that was an original or a copy, and it's an original, correct?
>
> WITNESS:    Yes, Your Honor.

Belowich Dec., Ex. G at 640:24-642:18 (emphasis added).

In addition to the foregoing (which, in and of itself, is sufficient to satisfy the publication element of a defamation claim), Mayor Amicone testified that he first saw the November 1, 2007 edition of the *Guardian* when "somebody brought it to [him] and told [him] they had read it." *See* Belowich Dec. Ex. G at 611:23-611:25.  Mayor Amicone also testified that people came to him asking whether the defamatory statement was true.  *See id.* at 625:6-625:24.  Mayor Amicone established publication by the Counterclaim Defendants of the defamatory statement.

### D.    The Statement Was False

Mayor Amicone also established that the defamatory statement was false.  Mayor Amicone testified that: (1) he does not frequent strip clubs; (2) he has never been to the VIP Club or any other strip club; (3) he never "had a 'lap dance' from a girl by the name of Sassy;" (4) he

never had a lap dance; and (5) the statement that he "frequents strip clubs" and that he even "had a 'lap dance' from a girl by the name of Sassy" is false. *See* Belowich Dec., Ex. G at 603:11-603:23, 607:16-607:17. The Counterclaim Defendants failed to present <u>any evidence</u> to the contrary. Zherka claims that Mayor Amicone had a "lap dance" at the VIP Club. However, Zherka testified that he never saw Mayor Amicone at the VIP Club and that he does not have any videotapes or other admissible evidence to prove that Mayor Amicone ever went to the VIP Club or any other strip club. *See* Belowich Dec. Ex. H. at 673:24-674:14, 675:6-675:14, 694:25-695:16. It is clear, based upon the foregoing, that the defamatory statement was in fact false.

### E.    The Statement Was Published With Actual Malice

Finally, Mayor Amicone established at trial that the defamatory statement was published with actual malice. The Second Circuit has explained the standard of actual malice as follows:

> Despite its name, the actual malice standard does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of the publication. If it cannot be shown that the defendant knew that the statements were false, a plaintiff must demonstrate that the defendant made the statements with reckless disregard of whether they were true or false. The reckless conduct needed to show actual malice is not measured by whether a prudent man would have published, or would have investigated before publishing, but by whether there is sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of the publication.

*Stern*, 645 F. Supp. 2d at 277-78 (quoting *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001).

"Factors for a court to consider in determining whether a defendant acted with actual malice include (1) whether a story is fabricated or based on an unverified anonymous source; (2) whether the allegations at issue 'are so inherently improbable that only a reckless person would have put them in circulation'; and (3) whether there are any obvious reasons to doubt the truthfulness of the defendant's source or the accuracy of the source's report." *Stern*, 645 F.

Supp. 2d at 278 (citing *Behar*, 238 F.3d at 174). "In determining whether a plaintiff has adduced sufficient evidence to reach a jury, the Court may consider plaintiff's evidence of actual malice in the aggregate." *Id.* (citing cases). *See also Celle v. Filipino Reporter Enterprises, Inc.*, 209 F.3d 163, 182-83 (2d Cir. 2000).

In deciding Mayor Amicone's motion for summary judgment, this Court found that there was sufficient evidence for a jury to conclude that the defamatory statement was published with actual malice. *See* Belowich Dec., Ex. D at 24:12-25:7, 25:13-25:19. This finding was fully supported by the evidence presented at trial, which established, among other things, that: (1) the Counterclaim Defendants wanted Mayor Amicone to lose the November 2007 mayoral election; (2) the Counterclaim Defendants previously published numerous articles that were highly critical of Mayor Amicone's performance; (3) Zherka caused eleven lawsuits to be filed against Mayor Amicone and/or the City of Yonkers prior to publication of the defamatory statement on November 1, 2007; (4) Blassberg made no efforts to confirm the truthfulness of the defamatory statement; (5) Zherka had no first-hand knowledge as to the truthfulness of the defamatory statement; and (6) the Counterclaim Defendants recklessly published a statement that Mayor Amicone "frequents strip clubs" (plural). Each of these points is detailed below.

### 1.    The Counterclaim Defendants Wanted Mayor Amicone to Lose the 2007 Mayoral Election

The evidence adduced at trial establishes that the Counterclaim Defendants wanted Mayor Amicone to lose the November 2007 mayoral election and that the defamatory statement published in the November 1, 2007 edition of the *Guardian* was intended to convince voters that it was "time for Dennis Robertson." Blassberg admitted that he did not want Mayor Amicone to win the election. *See* Belowich Dec., Ex. G at 629:15-630:6. Zherka admitted that various companies that he owns, including the Guardian News, Inc., contributed approximately $25,000

to Dennis Robertson's campaign. *See* Belowich Dec. Ex. H at 667:11-668:23. Zherka also admitted that he wanted Mayor Amicone to lose the election and that he "would have supported the devil... against [Mayor] Amicone." *See id.* at 669:7-669:9, 684:23-685:16.

### 2.    The Counterclaim Defendants Previously Published Numerous Articles that Were Highly Critical of Mayor Amicone's Performance

The evidence presented at trial established that the Counterclaim Defendants wrote, published and distributed numerous articles in the *Guardian* that were <u>highly critical</u> of Mayor Amicone in the months leading up to the election. *See* Belowich Dec. at Exs. K, M-Q. These articles demonstrate that each of the Counterclaim Defendants -- Blassberg, Zherka and the Guardian News, Inc. -- harbored feelings of ill will towards Mayor Amicone.

### 3.    Zherka Caused Eleven Lawsuits to be Filed Against Mayor Amicone and/or the City of Yonkers Prior to November 1, 2007

This Court may take judicial notice of the fact that Zherka caused the following eleven lawsuits to be filed against Mayor Amicone and/or the City of Yonkers prior to publication of the defamatory statement in the November 1, 2007 edition of the *Guardian* newspaper: *Guevara v. Amicone* (No. 07 Civ. 6941); *Smith v. Amicone* (No. 07 Civ. 6946); *Guardian News Inc. v. Amicone* (No. 07 Civ. 7078); *Ayala v. Amicone* (No. 07 Civ. 7080); *Kllapija v. Amicone* (No. 07 Civ. 7597); *Gonzalez v. Amicone* (No. 07 Civ. 7600); *Dzikovic v. Amicone* (No. 07 Civ. 7692); *Sayegh v. Amicone* (Case No. 07 Civ. 8048); *Lukaj v. Amicone* (No. 07 Civ. 8184); *Ayala v. City of Yonkers* (No. 07 Civ. 8186); and *Zherka v. Amicone* (No. 07 Civ. 9618).[8]

---

[8] The Court may also take judicial notice of the fact that Zherka caused an additional five lawsuits to be filed against Mayor Amicone and the City of Yonkers after publication of the defamatory statement in November 2007, including: *Zherka v. Amicone* (No. 07 Civ. 9618); *Blassberg v. Amicone* (No. 08 Civ. 1506); *Zherka v. Bogdanos* (No. 08 Civ. 2062); *O'Neill v. Edelman* (No. 08 Civ. 5756); and *Morales v. Edelman* (No. 08 Civ. 5757).

### 4.   Blassberg Made No Efforts to Confirm the Truthfulness of the Defamatory Statement

Blassberg testified that he believed the defamatory statement to be true based solely upon something that Zherka told him. *See* Belowich Dec., Ex. G at 637:21-639:16, 642:19-642:25. Blassberg made <u>no efforts</u> to confirm what Zherka told him because he believed "that [his] publisher would not have [him] perpetuate an untruthful statement." *See id.*   Given the animosity between Blassberg and the Mayor (*see* Belowich Ex. D at 24:15-25:5), this fact alone is sufficient to establish that Blassberg and the Guardian News, Inc. acted with actual malice.

### 5.   Zherka Lacked Knowledge as to the Truthfulness of the Defamatory Statement

Zherka testified that he believed the defamatory statement to be true based upon conversations that he supposedly had with a manager and hostess of the VIP Club, which he owns. *See* Belowich Dec., Ex. H at 673:24-674:4, 685:21-.687:11, 694:19-694:24.  But Zherka admitted at the trial that (i) he never saw Mayor Amicone at the VIP Club; (ii) he did not have any videotape of Mayor Amicone at the club; and (iii) he did not know the name of the manager or hostess who supposedly saw Mayor Amicone at the club. *Id.* at 674:5-674:14, 675:7-675:14. This testimony is sufficient to establish that Zherka and the Guardian News, Inc. published the defamatory statement with actual malice.

### 6.   The Counterclaim Defendants Recklessly Published that Mayor Amicone "Frequents Strip Clubs"

Zherka and Blassberg testified that they believed, at the time the defamatory statement was published, that Mayor Amicone visited the VIP Club on <u>one occasion</u>. *See* Belowich Dec., Ex. G at 637:21-639:16, Ex. H at 694:19-694:24.  Zherka also testified that he did not know whether Mayor Amicone ever visited any other strip club. *See* Belowich Dec., Ex. H at 694:25-695:16.  Yet, the November 1, 2007 edition of the *Guardian* falsely states that Mayor Amicone

"frequent*s* strip clubs" (plural) -- it does not state that Mayor Amicone frequented a strip club on one occasion (which, as demonstrated above, is also false). *See* Belowich Dec., Ex. L; Ex. H at 694:19-696:2. This fact, when considered in the aggregate, establishes that the Counterclaim Defendants acted with actual malice.

The jury's verdict on Mayor Amicone's counterclaim and third-party claim for defamation *per se* clearly resulted from the unconstitutional taint that permeated this trial, such that judgment as a matter or law or, alternatively a new trial on this claim is warranted.

## CONCLUSION

For all of the foregoing reasons, it is respectfully submitted that this Court should issue an Order: (i) granting judgment as a matter of law dismissing Plaintiffs' claims against Mayor Amicone, or alternatively ordering a new trial on the issue of whether punitive damages are warranted, and if so in what amount, or alternatively ordering a reduction of the punitive damages award to an amount that is not unconstitutionally excessive; (ii) granting judgment as a matter of law in favor of Mayor Amicone on his counterclaim and third-party claim for defamation *per se* or, in the alternative, ordering a new trial on the defamation claim; and (iii) granting to Mayor Amicone such other and further relief as this Court deems just and proper.

Dated: November 11, 2010
    White Plains, New York

Respectfully submitted,

DELBELLO DONNELLAN WEINGARTEN
WISE & WIEDERKEHR, LLP

By: _____
    Brian T. Belowich (BB 6910)
    1 North Lexington Avenue
    White Plains, New York 10601
    (914) 681-0200

    Attorneys for Philip Amicone